## FELLOWS v. BORDEN'S CONDENSED MILK CO.

(Circuit Court, S. D. New York. July 12, 1910.)

1. PATENTS (§ 26*)—INVENTION—COMBINATION OF OLD ELEMENTS—"PATENTABLE COMBINATION."

A combination of old elements to be patentable must operate in a new way to produce a new or an improved result, and the change from the old art must be such a one as would not occur to the ordinary mechanic skilled in the art.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. § 26.*

For other definitions, see Words and Phrases, vol. 6, p. 5234.

Patentability of combinations of old elements as dependent on results attained, see note to National Tube Co. v. Aiken, 91 C. C. A. 123.]

2. PATENTS (§ 328*)—INVENTION—SOLDER-SAVING DEVICES.

The Fellows patent, No. 586,964, for a solder-saving device which consists of two endless belts and means for operating them so that their opposing faces travel in opposite directions at different speed, and so spaced as to receive between them sheet metal cans as they leave the soldering bath and rotate them rapidly as they pass between the belts so as to throw off by centrifugal force any excess of melted solder, is void for lack of patentable invention, there being no invention in the conception of the idea that the solder could be thrown off by centrifugal force and the means being an old mechanism used in the same art for applying fluxing material to the cans before soldering adapted with but slight changes in construction within the skill of any mechanic, and the device as a whole being of no practical utility. The later Fellows patents, Nos. 586,966, 586,967, 595,704, and 595,705, covering further devices for the same purpose in which a brush or a jet of steam or vapor is used to better fill the joints and remove the surplus solder, both of which were in previous use, are also void for lack of patentable invention, being merely for adaptations of mechanism used in the prior art to a new but so nearly analogous use that their applicability thereto would occur to any mechanic, and constituting a case of double use.

In Equity. Suit by Olin S. Fellows against Borden's Condensed Milk Company. Decree for defendant.

Gifford & Bull (Livingston Gifford and Emilius W. Scherr, Jr., of counsel), for complainant.

Masten & Nichols (Walter D. Edmonds, of counsel), for defendant.

RAY, District Judge. The patents in suit are termed by complainant the "Solder Saving Patents of Olin S. Fellows," and, five in number, relate to that subject. They are numbered and dated as follows: No. 586,964, dated July 27, 1897; No. 586,966, dated July 27, 1897; No. 586,967, dated July 27, 1897; No. 595,704, dated December 21, 1897; and No. 595,705, dated December 21, 1897.

In No. 586,964, application filed September 12, 1896, the earliest of the five applications, the patentee says:

"My invention relates to the manufacture of sheet-metal cans in which the end plates are soldered to cylindrical can-bodies. In the ordinary process of manufacture the end plates are applied to the can-bodies, and the exterior edges of the can thus assembled are successively rolled over in contact with baths of molten solder, thereby introducing the solder between the flanges of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

422 180 FEDERAL REPORTER.

the end plates and the opposed edges of the can-body. This method is simple and desirable, because the soldering operation is continuous and rapid, but it is wasteful of solder, since an excess thereof is taken up and carried away by the exterior surfaces of the can, not only adding to the weight and cost of the can, but also impairing its symmetry.

"The object of my invention is to save practically all the superfluous solder taken up by the cans and at the same time to render them more perfect and symmetrical in external appearance; and the invention consists, essentially, in the use of means for imparting to the cans after they leave the soldering-bath and while the solder is in a fluid state a sufficient degree of centrifugal force to throw off the excess of solder from the exterior surfaces of the cans, substantially as herein set forth. * * *

"It is obvious that the necessary degree of centrifugal force may be imparted to the cans after they leave the soldering-bath by various mechanical expedients and that they may be thus treated individually and intermittently. I prefer, however, to treat them continuously and simultaneously as they roll from the soldering-bath, and this I accomplish by passing them between a traveling surface and a support, shown in the present instance as consisting of two endless belts, A and B, speeded to rotate the cans on their axes with sufficient centrifugal force to throw off the excess of solder, one of the belts traveling faster than the other, so that the cans received at one end will be finally discharged at the other.

"In ordinary practice the cans are transferred directly from one soldering-bath, in which one end of the cans is soldered, to another soldering-bath, in which the other end is soldered, the incline of the cans being changed between the baths by a gradual change in incline of the ways. I interpose one of my solder-saving devices between the soldering-baths and place another to receive the cans from the second bath, but they are practically the same in construction and operation, and one description will answer for both. * * *

"I have found by practical test and experience that by my method of utilizing centrifugal force for the recovery of superfluous solder, as set forth, I can effect a material saving in the cost of soldering end caps to can-bodies and at the same time produce cans of superior and more uniform appearance.

"Where one belt moves at a greater speed than the other, as the upper belt in the accompanying drawings, such faster-moving belt not only forwards the cans through the apparatus, but also spaces them so that they pass through without contact with each other. In other words, the faster belt naturally grasps and forwards each can as fed to it in such manner that it will be in advance and out of contact with the next succeeding can, and this relation of the cans is maintained until they are discharged at the opposite end of the apparatus.

"I am aware that it has been proposed to pass cans through a cooling-machine by means of fingers or separators on an endless belt acting in conjunction with the opposed surface of a belt traveling in the opposite direction, as in the patent to Kendall, No. 469,389, dated February 23, 1892, but that patent does not anticipate the essential principle of my invention, neither does it show my special construction and arrangement of parts for giving practical effect thereto. The object of the Kendall device is to effect the cooling of the cans in less time and space than formerly even resorting to a cold-air blast for this purpose, and he utilizes centrifugal force only for the purpose of retaining the excess of solder on the cans by preventing the running and dripping of the melted solder, whereas I drive off the superfluous solder by means of centrifugal force, thereby effecting greater perfection and economy in the manufacture of the can, results entirely new to the state of the art."

His claims, both in issue, read as follows:

"1. In a solder-saving device, the combination of an endless traveling surface and an opposed can-support arranged to receive the cans between them, and means for producing a relative motion between said traveling surface and can-support, whereby a speed of rotation is imparted to the cans sufficient to throw off from said cans, by centrifugal force, any excess of melted solder, substantially in the manner described.

"2. In a solder-saving device, the combination of two endless belts with opposed surfaces arranged to receive the cans between them, said opposed surfaces traveling in opposite directions and at different speeds so that the cans are spaced and forwarded by the faster-moving belt while the slower-moving belt increases the axial rotation of the cans, and means for producing a relative motion between said opposed belt-surfaces whereby a speed of rotation is imparted to the cans sufficient to throw off from said cans, by centrifugal force, any excess of melted solder, substantially in the manner described."

It was conceded on the final hearing and is shown by the proof, and I find as a fact that, while this rapid revolution of the cans fresh from the solder bath would throw off superfluous solder, it would frequently throw off too much at points so as to leave unsoldered places, causing leaks. The result was these defective cans had to be resoldered at such points or discarded. To remedy this defect and the further defect that the solder did not always flow into the seam and fill it so as to make a tight joint, a brush device was added to the apparatus covered by patent No. 586,966, serial No. 606,326, whereby the surplus solder not actually thrown off by the centrifugal force but piled up, so to speak, near the corners of the can, was brushed off so that the removal of the superfluous solder was now effected by the combined action of centrifugal force, tending to throw off the molten solder, and the brush which brushed or swept off the solder not thrown off. The brush action had not only a tendency to polish the flanges and lower ends of the can-bodies, but served the important purpose of, says the patent: "The brush also performs another important function, in that it insures a perfect joint between the opposed surfaces of the end plate and can-body by forcing the solder in between said opposed surfaces, thereby compensating for any lack or inequality in the flow of solder." This means what the evidence shows that in revolving the edge or corner of the can in the solder bath the solder would not always uniformly flow into the space between the can-body and end plates, and if it did not, and the can on leaving the bath was subjected to the rapid whirling motion and the solder thrown off, there would be an unsoldered space or spaces and a consequent leak. It is probably true that the brush not only took off superfluous solder but acted as a polisher where it came in contact with the can, but the main purpose and the real purpose of the brush action is to push the solder into the spaces not filled by it while in the bath; that is, in the language of the specification, "thereby compensating for any lack or inequality in the flow of solder."

Claim 1 of this patent, which is in issue here, we may term the Brush-Fellows patent, and reads as follows:

"In a solder-saving device, the combination with an endless traveling belt and an opposed can-support arranged to receive the cans between them and to impart to the said cans a speed of rotation sufficient to throw off by centrifugal force the main portion of the excess of melted solder adhering thereto while forwarding them and rotating them axially in the direction of their line of progress, of a brush arranged to act upon the soldered edges of the cans, thereby insuring perfect joints by brushing the solder in between the opposed surfaces of the can-bodies and end plates while removing the superfluous solder and polishing the exteriors of the joints, substantially in the manner described."

This brushing process of this patent was performed by an endless brush belt moving in the same direction or parallel with the carrying belts, and it appears from this patent No. 586,966 that Fellows had a patent or an application for a patent, serial No. 605,967, filed September 16, 1896, for saving solder by this endless brush chain process of which he says:

"In my application, serial No. 605,967, also hereinbefore referred to, I accomplish a similar result" (solder saving) "by means of an endless brush belt acting in conjunction with mechanism for passing the soldered cans continuously and severally in contact with an endless brush belt. Both of the above-mentioned methods give good practical results, but I have found by experiment and investigation that the most perfect and satisfactory results are attained by combining the two methods," etc.

The operation of this endless chain brush moving in the same direction as the can was not fully satisfactory as the movement of the solder brushed or carried with it was parallel with the space to be filled, if left unfilled on leaving the bath and not into it, at least not directly into it. This was remedied or corrected as follows: October 12, 1896, Fellows filed an application for patent No. 586,967, issued July 27, 1897 (serial No. 608,597). The specification says:

"The invention consists in the combination and arrangement, with the means for rolling and forwarding a plurality of cans continuously and simultaneously, of a brush acting on the edges of the cans at right angles to their line of motion, substantially as hereinafter described and claimed.

"By my improvement I attain more uniform results, the solder being positively forced under the flanges of the end plates where required and the percentage of leakage being reduced, since all parts of the annular joints are subjected to the same treatment and pressure. The cans obtained by this treatment are stronger and cleaner than any heretofore produced, the soldered joints being continuous and perfect and all superfluous solder being swept off the ends of the cans in line with their longitudinal axes in such manner that the brush cannot spatter the cans, and removes therefrom any spatterings received during the centrifugal action. This treatment of the ends of the cans, as they flow continuously through the apparatus to the action of a brush rotating at right angles to their line of procession and rotation, may be combined with and follow the treatment of the cans to centrifugal force for the purpose of throwing off most of the superfluous solder, especially from the end plates, and of presenting the remainder to the brush in the most favorable position for removal thereby, as set forth in my concurrent application last mentioned, although I do not limit myself to this combination, since I believe myself to be the first to treat a plurality of cans rotated and forwarded by an endless belt or belts to the action of a brush acting at right angles to their line of motion.

"I am aware that it has been proposed to use circular buffers or brushes to remove superfluous solder from cans held and treated individually. I am also aware that it has been proposed to treat cans held and rotated individually to the action of an endless wiper-belt, but neither of these anticipate my invention, which consists, essentially in rotating the cans as they leave the soldering-bath in a continuous procession by means of an endless belt or belts in such manner as to present their freshly-soldered annular joints to a brush acting at right angles to their line of motion, thereby insuring a perfect and continuous joint of solder between the flanges of the end plates and the ends of the can-bodies, at the same time removing all superfluous solder and finishing off or polishing the edges of the cans without interfering with or retarding their continuous flow from the soldering-bath and through the apparatus."

The claims of this patent in issue read as follows:

"1. In a solder-saving device the combination with endless belts arranged to receive and advance the cans between them substantially as described, of a brush arranged to act upon the edges of a plurality of the cans substantially at right angles to their line of motion, substantially in the manner and for the purpose set forth.

"2. In a solder-saving device the combination with endless belts traveling in opposite directions and arranged to receive and advance the cans between them substantially as described, of a brush arranged to act upon the edges of a plurality of the cans substantially at right angles to their line of motion, substantially in the manner and for the purpose set forth.

"3. In a solder-saving device the combination with endless belts traveling at different speeds in opposite directions, arranged to receive and advance the cans between them substantially as described, of a brush arranged to act upon the edges of a plurality of the cans substantially at right angles to their line of motion, substantially in the manner and for the purpose set forth.

"4. In a solder-saving device the combination with an endless traveling belt and an opposed can-support arranged to receive and advance the cans between them and to impart to the said cans a speed of rotation sufficient to throw off by centrifugal force the main portion of the excess of melted solder carried from the soldering-bath, of a brush arranged to act upon the edges of a plurality of the cans in a direction substantially at right angles to that of their line of motion for the purpose and substantially in the manner described.

"5. In a solder-saving device the combination with endless traveling belts, arranged to receive and advance the cans between them and to impart to the said cans a speed of rotation sufficient to throw off by centrifugal force the main portion of the excess of melted solder carried from the soldering-bath, of a brush arranged to act upon the edges of a plurality of the cans in a direction substantially at right angles to that of their line of motion, for the purpose and substantially in the manner described.

"6. In a solder-saving device the combination with endless belts traveling in opposite directions arranged to receive and advance the cans between them and to impart to the said cans a speed of rotation sufficient to throw off by centrifugal force the main portion of the excess of melted solder carried from the soldering-bath, of a brush arranged to act upon the edges of a plurality of the cans in a direction substantially at right angles to that of their line of motion, for the purpose and substantially in the manner described.

"7. In a solder-saving device the combination with endless belts traveling at different speeds in opposite directions, arranged to receive and advance the cans between them and to impart to the said cans a speed of rotation sufficient to throw off by centrifugal force the main portion of the excess of melted solder carried from the soldering-bath, of a brush arranged to act upon the edges of a plurality of the cans in a direction substantially at right angles to that of their line of motion, for the purpose and substantially in the manner described."

These devices not being perfectly satisfactory or being desirous of other improvements in the art, May 10, 1897, Fellows filed application for patent No. 595,704, serial No. 635,904, granted December 21, 1897. This relates to the same subject and the patentee says:

"And the invention consists, essentially, in simultaneously forwarding the cans, rotating them on their axes, and subjecting them to a fluid-blast in such manner as to remove superfluous solder taken up by the exterior surfaces of the cans while passing through the solder-bath during the operation of soldering the end plates to the can-bodies, substantially as hereinafter set forth. * * * I treat the edges of the cans after they leave the soldering-bath continuously and simultaneously to fluid under pressure directed to impinge against the exterior portions of the cans where they have been

exposed to direct contact with the solder in the bath, the rotation of the cans upon their axes as they are advanced through the device subjecting all such exposed portions uniformly to the cleansing action of the fluid-blast, and insuring the removal of superfluous solder from such adjoining portions of the end plates and can-bodies without impairing the hermetical sealing of the joints between said parts of the cans. This I accomplish by passing them between a traveling surface and a support shown in the present instance as consisting of two endless belts, A and B, one of the belts traveling faster than the other, so that the cans received at one end will be finally discharged at the other. * * * I have found by experience that the removal of the superfluous solder from cans by a vapor bath can be accomplished advantageously, the blast leaving the surfaces exposed to the solder clean, clear, and bright."

Claim 1 of this patent is in issue and reads as follows:

"In a solder-saving device, the combination of an endless traveling surface and an opposed can-support arranged to receive the cans between them, means for producing a relative motion between said traveling surface and opposed can-support whereby the cans are simultaneously rotated axially and forwarded, and means for directing fluid under pressure against the cans between said traveling surface and opposed can-support for the purpose of removing superfluous solder from the cans substantially in the manner described."

I think it clear that this patent has nothing to do with removing superfluous solder from cans by means of centrifugal force. The cans are revolved so as to subject all parts of the soldered surface to the vapor or steam bath.

May 10, 1897, Fellows filed an application for patent No. 595,705, dated December 21, 1897, and he says:

"My improvements relate to the removal of superfluous solder from sheet-metal cans for the purpose set forth in my concurrent applications, serial Nos. 605,598, 605,967, 606,536, 608,597, and 635,904.

"The distinguishing feature of my present invention consists in retarding the progress of the cans as they pass through the apparatus for the purpose of treating them individually for the removal of superfluous solder, substantially as hereinafter set forth.

"My invention also includes certain special features in the combination and arrangement of parts for polishing and cooling the cans and controlling and collecting the superfluous solder removed from them. * * *

"It is obvious that by imparting a sufficiently high degree of speed to the forwarding-wheel, F, the cans resting against the rails, C, may be rotated upon their axes in such manner as to throw off by centrifugal force superfluous solder, substantially as set forth in my concurrent applications hereinbefore referred to, and I do not seek to cover, broadly, herein means for throwing off superfluous solder by centrifugal force. By substituting the driving-wheel, F, for the driving-belts described in said prior applications I am, however, enabled to construct an effective apparatus which is much more simple and compact, and in which the results sought are much more quickly and positively attained. * * *

"Where it is desired to polish the exterior surface of the can by positive mechanical means after it has been subjected to the action of centrifugal force or to the action of the jets of heated vapor, I employ a rotary brush, B, in conjunction with the forwarding-wheel, F, and auxiliary brush-wheel, A³, arranged, preferably, so as to impinge against the soldered joint, as indicated in Fig. 9. It is obvious that this arrangement may also be used alone for the removal of superfluous solder, the main novelty in this connection consisting in the special combination and arrangement of the forwarding mechanism and auxiliary detaining-wheel and the rotating brush, B, whereby the cans are retarded in progress and the number of revolutions on their axes is increased while being subjected to the action of the brush, B."

The claims in issue are 1, 2, 4, 5, 6, 7, and 10.   These read as follows:

"1. In solder-saving apparatus, the combination of a can-forwarding surface, a can-retarding wheel moving in a direction opposite to that of the said can-forwarding surface, and means for effecting the removal of superfluous solder from the cans while rotating between said opposed traveling surfaces, substantially in the manner and for the purpose described.

"2. In solder-saving apparatus, the combination of a can-forwarding wheel, an opposed auxiliary wheel revolving in the opposite direction, and means for effecting the removal of superfluous solder from the cans while rotating between said opposed wheels, substantially in the manner and for the purpose described.   *   *   *

"4. In solder-saving apparatus the combination of a can-forwarding surface, and an opposed auxiliary wheel revolving in the opposite direction for the purpose of retarding the advance of the cans and increasing their axial rotation, substantially in the manner and for the purpose set forth.

"5. In solder-saving apparatus the combination of a can-forwarding surface, opposed rails, and an opposed auxiliary wheel revolving in the opposite direction for the purpose of retarding the advance of the cans, substantially in the manner and for the purpose set forth.

"6. In solder-saving apparatus the combination of a can-forwarding surface, an opposed auxiliary wheel revolving in the opposite direction for the purpose of retarding the advance of the cans and increasing their axial rotation, and means for projecting jets of vapor against said cans substantially in the manner and for the purpose described.

"7. In solder-saving apparatus the combination of a can-forwarding surface, an opposed auxiliary wheel revolving in the opposite direction for the purpose of retarding the advance of the cans, and means for projecting jets of superheated steam against said cans, substantially in the manner and for the purpose described.   *   *   *

"10. The combination of apparatus for removing the superfluous solder from cans, a hood surrounding said solder-removing apparatus, an exhausting device for withdrawing the air from said hood and injecting it into a receiving-chamber, and said receiving-chamber provided with means for retaining the solid particles of matter carried over to it by the air, substantially in the manner and for the purpose described."

The main distinguishing features of this patent seem to be the hood for retaining flying particles of solder and the "retarding wheel" mode of operation which complainant says is "peculiar to Fellows patent 595,705." While Fellows may have been and probably was the first to use centrifugal force for the removal of superfluous solder from cans by rapidly revolving them and thereby saving the thrown off solder, if care was taken to preserve it, he was not the first to conceive a solder-saving device in can construction, as others had used devices for wiping off the superfluous solder, thereby giving the completed cans a neater appearance and lighter weight and saving the superfluous solder.   See patent to Norton, No. 382,320, dated May 8, 1888, and patents to Jensen, No. 551,122, dated December 10, 1895, and No. 550,176, dated November 19, 1895.   When the superfluous solder was wiped off it was saved or in a condition to be saved if care was taken.   See, also, patent to Edwards, No. 301,579, dated July 8, 1884, for Tin Can Soldering Machine, which has a wiper and says:

"After having one seam, o¹, soldered, the cans are moved up the inclined parts, D¹, of the rails, D, and during this operation the excess of solder may be wiped off by a wiper, N, and collected in a box, n, thereby saving solder and improving the appearance of the seam. The wiper may be made of any spongy or soft material, which presses against the seam of the can; or a blast

of air or steam or any gas may be blown against the freshly-soldered seam, as shown in Fig. 10, in which nozzles, $N^1$, having slits $N^2$, are directed against the can as it rises out of the solder, and blows the excess back to the rear edge of the seam and off into the solder trough or a box, leaving a highly-finished seam."

It was also common knowledge that water, mud or any molten substance such as lead or solder in what may be termed a molten state would fly off from the outside of any circular body when rapidly revolved. Water thrown from a revolving grindstone or mud from the wheel of a rapidly moving wagon are familiar illustrations. However it does not follow that there was no patentable novelty in conceiving the idea that this motion might be applied to the saving of solder when manufacturing tin or sheet iron cans and providing suitable means for the purpose. The prior art wiped off the superfluous solder by some soft material or by a blast of air or steam or gas, and so saved it, while Fellows first threw it off by centrifugal force—that is, by rapidly revolving the cans; second, by revolving the cans and brushing off the solder; and, third, by spraying or subjecting the superfluous solder to the action of steam or vapor while in rapid revolution.

It may be well to say here that the alleged infringing device used by the defendant removes the superfluous solder by all three methods in succession—that is, as the cans come from the bath, the corners having been revolved in the solder, they pass along held between moving surfaces, one moving in one direction, and the other in the opposite direction, but moving at unequal speed, and some surplus solder is thrown off by centrifugal force, and then, while still moving forward and revolving, they come under the action of the brush whereby solder is swept into the seams if they are not already full, and more of the solder is swept off, and then, still moving forward and revolving the cans come under the action of the steam or vapor blast, and the removal of solder and the polishing is completed. While undergoing this last operation the "retarding wheel" mode of operation comes into play.

These Fellows patents all relate to "means for removing superfluous solder from sheet-metal cans." It is apparent from the reading of them that saving solder was not the only purpose in view. Each of the claims of the patents in suit in issue are for a combination, and a patentable combination may consist of elements some of which are old and some new or of elements all old provided there is a new combination of such old elements operating in a different way (different from the old art) to produce and producing a new or an improved result. Leeds v. Victor Co., 213 U. S. 318, 29 Sup. Ct. 495, 53 L. Ed. 805. Of course, to be patentable, there must be such a change in the combination as would not occur to the ordinary mechanic skilled in the art. In other words there must be what is known as patentable conception. On the argument I was somewhat impressed with the thought that there is not patentable conception accompanied by means to make it effectual in the idea of throwing off and saving surplus solder by centrifugal force—that is, by rapidly revolving the cans.

It seemed to me such common knowledge that any one desirous of throwing off the superfluous solder would use this method.

Claim 1 of the patent first mentioned, No. 586,964, has in combination (1) an endless traveling surface, and an opposed can support which receive the cans between them; and (2) means for producing a relative motion between them whereby a speed of rotation is imparted to the cans sufficient to throw off from said cans, by centrifugal force, any excess of melted solder in the manner described. The patent shows and describes two endless belts each on wheels or pulleys, the one belt above the other. The movement of that part of each belt above its wheels or pulleys is from right to left as shown in Fig. 3, and the movement of that part of each belt below its wheels or pulleys is from left to right, but as the cans are fed in between these belts they are taken hold of by the lower surface of the belt of the upper section moving from left to right, and by the upper surface of the belt of the lower section moving from right to left. Hence the surfaces of the two belts in actual contact with the cans move in opposite directions. As the one belt is made to move faster than the other, a rotary motion is given each can on its own axis and still they are carried forward and discharged at the end opposite the place of entrance. The speed of rotation is regulated by the relative speed of the belts. By having the speed of the one belt but little greater than that of the other the rotation of the can on its axis would be slow. If both belts are of the same size and move with the same speed and exert the same pressure on the can the can would not move forward or be carried forward at all, as the forwarding and retarding process would be equal and neutralize each other, and if the belt surfaces in contact with the cans moved in the same direction and at the same speed the can would be carried forward without rotation. Fig. 3 of this patent shows a bar or rail, gg, to keep the cans in alignment while passing between the belts. Turning to the prior art for this mechanism used to clasp, so to speak, the cans and forward them, we find much of the same mechanism operating in much the same way in the patent to C. B. Kendall, dated February 23, 1892, for "Can Cooling Machinery," except that he does not rotate the cans by moving the one belt faster than the other, but relies wholly on the fact that the face of the one belt bearing on the can moves in the opposite direction from the face of the other belt bearing on the can. He also has pins in the upper belt to keep the cans apart. He has two endless belts each running on its own wheels or pulleys arranged the one above the other. These belts move the same as in the Fellows patent just mentioned, but so far as appear at the same speed, and as the can comes from the solder bath it is moved in and taken between the two belts, the lower half of the upper belt moving in one direction as from left to right, and the upper half of the lower belt moving in the opposite direction, and the patentee after explaining this says that "whenever the words 'oppositely traveling belts' are used they are to be understood as 'oppositely traveling faces.'" He expressly states, in substance, that the pins in the upper belt carry the cans forward while the oppositely moving surface of the lower belt in contact with the

can retards the forward movement and has the effect to rotate the can. He might have separated the cans by having the one belt move faster than the other instead of using the pins, but did not. His purpose was to retain the solder on the seam of the can uniformly and allow it to cool. He expressly says that he imparts enough centrifugal force to keep the solder in position until cool, and to cool the solder rapidly he has pipes along the line of travel through which cold air is blown or forced on the soldered part. If he had caused the one belt to move more rapidly than the other he could have dispensed with the pins, as the cans would have been separated and kept separate automatically, and by imparting sufficient speed he would have thrown off solder. But all he was aiming at was the cooling process. Here I find no anticipation. However, Kendall has trackways, h, which "serve to maintain the outer ends of the cans in true line with the face of the belt."

In a patent to McDonald, No. 506,184, dated October 3, 1893, "machine for fluxing cans," a process which precedes the application of the solder, we have a device for moving the cans much nearer that of the complainant. He says:

"The invention consists in certain devices whereby the cans are rolled along through a machine in contact with belts carrying the flux, so that the joints between the ends and the body will be fluxed as the cans pass through the machine, and the cans will be delivered all ready for soldering, the operation being continuous."

On a frame is supported a long rectangular tank containing the liquid flux. At each end of this tank is mounted a shaft extending across the tank, and each shaft is provided with a pair of pulleys arranged on the shaft at a distance from each other less than the length of the can. On these pulleys are mounted endless belts extending the length of the tank, and these move when the pulleys revolve with the shaft and any speed desired may be communicated. These belts are flat and of considerable width, and support the cans as they move through the machine. These are the fluxing belts, and about one-half of these belts move at all times in the fluxing material in the tank and saturated therewith apply same to the seams at each end of the can as the belts move above the pulleys after leaving the tank. There is an inclined chute at one end of the machine down which the cans roll and are fed to or upon the belts. The fluxing belts or those parts thereof in contact with the cans move from right to left or towards the point where the cans enter from the chute. This is shown in Fig. 2, and it is so stated in the patent. The patent says:

"I will now describe the mechanism by means of which the cans are carried along with a rotary movement upon the fluxing belts from front to rear of the machine."

He then describes an endless belt mounted on pulleys, but above the supporting belts described, and running and traveling parallel with them, which comes in contact with the upper side of the cans midway the ends thereof as they enter the apparatus or between the two lower and this upper belt. All the belts travel in the same direction, but as the cans are in contact with the upper part of the lower belt and the lower part of the upper belt, the surface of the belts in contact with

the cans running on the lower pulleys move in a direction opposite to that of the surface of the belt in contact with the cans moving on the upper pulleys. He gives much greater speed to the upper belt than to the lower ones, and so moves the cans forward and revolves them on their axes as they pass between the upper and lower belts to the discharge end. This upper belt, and the lower belts also, are made adjustable so as to handle cans of different lengths and those of different diameters. There is a difference in the construction and means for propelling the belts of McDonald and those of Fellows, but they are mechanical merely, and would be made by any mechanic skilled in the art. McDonald has the side bars or guides to keep the cans in alignment and between the belts the same as Fellows. The mode of operation of the Fellow apparatus and of the McDonald apparatus is the same, and the result is the same—that is, the cans as they enter from the chute are grasped by the lower or supporting belt (belts with McDonald so as to flux both ends of the can at the same time) and the upper or propelling belt and separated and kept separated because of the more rapid forward movement of the upper belt, and they are moved forward continuously and successively in a flowing stream of cans, and each can while so grasped and flowing or moving forward is rapidly revolved on its own axis. In this grasping, moving, and revolving the cans axially McDonald was applying the flux to the seam at each end of the can, while in so grasping, moving, and revolving them axially Fellows was throwing off the surplus solder from the same seams one end at a time, as he only soldered one end at a time. The two supporting belts of McDonald covered the seams to be thereafter soldered so as to apply the flux thereto while Fellows only uses one, placed between the two ends of the can, so as to leave the solder uncovered and free to fly off. All there is to this first patent is that Fellows uses an old mechanism and mechanical movement then in use in this art for the purpose of applying the fluxing material before soldering for the purpose of removing the surplus solder. He made some necessary changes in belts and location thereof, but they show no improvement on the prior art. It is the case of the adaptation, by slight changes of construction, of a well-known appliance in use in the art of can construction to accomplish a certain purpose, to another use or to accomplish another purpose in the same art, an ultimate purpose it had not been used to accomplish before. Concede that Fellows conceived the idea that in can construction the surplus solder on the can might be removed and thereby saved by the application of centrifugal force, thereby throwing off the surplus solder, what he did was to adapt, by slight changes of construction within the skill of any mechanic, an old device used in the same art for giving the cans the same movement and motion, but with the purpose of applying fluxing material thereto, to the throwing off of such solder. Was he entitled to a patent for doing this? Fellows is presumed to have had the McDonald device before him and to have understood its operation. All he had to do was to feed the cans into this old device after being soldered first, moving the two lower belts so as to grasp or contact with the center of the side of the cans, and then impart sufficient velocity to throw off the solder.

In Topliff v. Topliff et al., 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658, one question was whether or not the Stringfellow and Surles patent was an anticipation of the Augur patent, one of the patents sued upon. The court said:

"While it is possible that the Stringfellow and Surles patent might, by a slight modification, be made to perform the function of equalizing the springs which it was the object of the Augur patent to secure, that was evidently not in the mind of the patentees, and the patent is inoperative for that purpose. Their device evidently approached very near the idea of an equalizer; but this idea did not apparently dawn upon them, nor was there anything in their patent which would have suggested it to a mechanic of ordinary intelligence, unless he were examining it for that purpose. It is not sufficient to constitute an anticipation that the device relied upon might, by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted, nor equally used, for the performance of such functions."

Another patent in suit was the Topliff and Ely patent, and it was claimed that the Augur device fully anticipated this. After pointing out the almost exact similarity of the two devices the court said:

"In the Topliff and Ely patent, to obviate this, and to enable the device to be applied at both ends of the springs, the links are turned horizontally, or somewhat dependent, so that the springs can rest upon them at both ends, and thus secure a more perfect equalization. Trifling as this deviation seems to be, it renders it possible to adapt the Augur device to any side-spring wagon of ordinary construction.

"While the question of patentable novelty in this device is by no means free from doubt, we are inclined, in view of the extensive use to which these springs have been put by manufacturers of wagons, to resolve that doubt in favor of the patentees, and sustain the patent."

In Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275, the court held:

"The cases treating of letters patent for new applications of old devices considered, and, as a result of the authorities, it is held that, if the new use be so nearly analogous to the former one, that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use; but if the relations between them be remote, and especially if the use of the old device produce a new result, it may involve an exercise of the inventive faculty—much depending upon the nature of the changes required to adapt the device to its new use."

It must be borne in mind that the McDonald patent is for work in the same field, the same industry, as the Fellows patent. The steps in making a can are (1) cut out the metal; (2) connect the body; (3) add the ends and crimp them; (4) apply the acid or flux or resin preparatory to applying the solder; (5) apply the solder; and (6) remove the surplus solder, and clean and polish. Here, in this industry McDonald had his apparatus for applying the flux, step 4 mentioned, and Fellows, in the same industry, by moving the supporting belts away from the seams or substituting one belt for two, as one only was necessary, threw off by the same movement of the cans (made more rapid probably) the solder applied by step 5. Others had wiped off, brushed off, and sprayed or steamed off the surplus solder, but, so far as appears, no one had thrown it off by centrifugal force. It was taking the old device of McDonald, making only one material change—that of the location of the lower or supporting belts—and

using it in the last step of making a can for throwing off the super-fluous solder.   On this subject in Potts v. Creager, supra, after referring to the cases, the court (at page 608, 155 U. S., at page 199, 15 Sup. Ct. [39 L. Ed. 275]) said:

"As a result of the authorities upon this subject, it may be said that, if the new use be so nearly analogous to the former one, that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use, but if the relations between them be remote, and especially if the use of the old device produce a new result, it may at least involve an exercise of the inventive faculty.   Much, however, must still depend upon the nature of the changes required to adapt the device to its new use."

Now I do not think that a device for use in can construction which would simply throw off solder while in a molten state was a patentable one.   It would not be and was not useful in the art.   It is necessary in the art to have a considerable portion of the solder retained on the can, but in the proper place to be of use; that is, in the seams and on them to an extent.   The result of operations with the apparatus made under and in accordance with the first Fellows patent, No. 586,964, demonstrated that it possessed no practical utility.   True, it threw off the solder taken up while revolving in the solder bath, but if, as was usual with some 30 per cent. of the cans, the solder had not flowed into the seams, or for any cause did not adhere properly, the solder that should be and remain in such seams was thrown off, and such cans were defective and discarded.   This device did not go into general use; it was not a success.   It was not only desired to throw off surplus solder after the seams were properly filled with solder, but to first fill such seams before any was thrown off and not move or disturb or throw off the solder in the seams, and this the device of the patent did not and could not do.   The first patent added nothing of value to the art of can construction.   The idea of throwing off surplus instead of wiping or brushing it off as had been done in the prior art was good, we will assume, provided it filled the seams and left them filled and so prevented leaking, the very object of soldering them at all.   I do not think it was patentable to conceive the idea that molten solder would be thrown off by centrifugal force applied to the can and molten solder accompanied by means to revolve the can rapidly and so throw it off.   In Potts v. Creager, supra (at page 605, 155 U. S., at page 197, 15 Sup Ct. [39 L. Ed. 275]), the court said:

"The employment of two parallel cylinders to co-operate in the performance of a certain task is so common and well known that the court may take judicial notice of such examples as are found in the ordinary clothes wringer, fluting rollers, straw cutters, printing presses, paper manufacturing machines and grinding mills of various kinds."

So here, the court may take judicial notice that it was well known and common knowledge that water, mud, and any soft material not adhesive would fly off from any circular body when rapidly revolved. To put the solder on and then throw it off accomplished no useful purpose in this art as the result proved.   It must be pushed into the seams when it had not flowed or run in.   After making the reference last above quoted the court in Potts v. Creager, supra, said:

"In view of these devices it is too clear for argument that Potts would not be entitled to a patent simply for passing the clay between two grinding or crushing cylinders," etc.

So here, it is clear that Fellows was not entitled to a patent for simply revolving a can rapidly and throwing off solder in a molten state by centrifugal force. In view of the fact that McDonald's device was in the can construction industry, and had to do with properly soldering the can, and that Fellows in the same industry and to complete the soldering process took McDonald's device and by simple changes within the ability of the ordinary mechanic, and by changes which would have occurred to any mechanic of ordinary skill, adapted it to throw off solder, the language of the court in Potts v. Creager, supra (at page 606, 155 U. S., at page 198, 15 Sup. Ct. [39 L. Ed. 275]), is very pertinent and instructive. The court said:

"The answer to this requires the consideration of the often recurring question, which has taxed the ingenuity of courts ever since the passage of the patent acts, as to what invention really is. When a patented device is a mere improvement upon an existing machine, and the case is not complicated by other anticipating devices, the solution is ordinarily free from difficulty. But where the alleged novelty consists in transferring a device from one branch of industry to another, the answer depends upon a variety of considerations. In such cases we are bound to inquire into the remoteness of relationship of the two industries, what alterations were necessary to adapt the device to its new use, and what the value of such adaptation has been to the new industry. If the new use be analogous to the former one, the court will undoubtedly be disposed to construe the patent more strictly, and to require clearer proof of the exercise of the inventive faculty, in adapting it to the new use—particularly if the device be one of minor importance in its new field of usefulness. On the other hand, if the transfer be to a branch of industry, but remotely allied to the other, and the effect of such transfer has been to supersede other methods of doing the same work, the court will look with a less critical eye upon the means employed in making the transfer. Doubtless a patentee is entitled to every use of which his invention is susceptible, whether such be known or unknown to him; but the person who has taken his device, and, by improvements thereon, has adapted it to a different industry, may also draw to himself the quality of inventor. If, for instance, a person were to take a coffee mill and patent it as a mill for grinding spices, the double use would be too manifest for serious argument. So, too, this court has denied invention to one who applied the principle of an ice-cream freezer to the preservation of fish (Brown v. Piper, 91 U. S. 37 [23 L. Ed. 200]); to another who changed the proportions of a refrigerator in such manner as to utilize the descending instead of the ascending current of cold air (Roberts v. Ryer, 91 U. S. 150 [23 L. Ed. 267]); to another who employed an old and well-known method of attaching car trucks to the forward truck of a locomotive engine (Pennsylvania Railroad v. Locomotive Truck Co., 110 U. S. 490 [4 Sup. Ct. 220, 28 L. Ed. 222]); and to still another who placed a dredging screw at the stem instead of the stern of a steamboat (Atlantic Works v. Brady, 107 U. S. 192 [2 Sup. Ct. 225, 27 L. Ed. 438]). In Tucker v Spalding, 13 Wall. 453 [20 L. Ed. 515], the patent covered the use of movable teeth in saws and saw plates. A prior patent exhibited cutters of the same general form as the saw teeth of the other patent, attachable to a circular disk, and removable as in the other, the purpose of which patent was for the cutting of tongues and grooves, mortices, etc. The court held that if what it actually did was in its nature the same as sawing, and its structure and action suggested to the mind of an ordinarily skillful mechanic this double use to which it could be adapted without material change, then such adaptation to a new use was not new invention, and was not patentable."

I am satisfied in view of the evidence, common knowledge, and the prior art, and considering the facts that the device of the first Fel-

lows patent, No. 586,964, is of no practical utility in the art, and is not a commercial success and has not displaced or taken the place of anything in this art, and is but the mere transfer of a device of the prior art from use in one step of soldering a can to another step in the same process, that patentable novelty is not disclosed. The next patent, No. 586,966, of July 27, 1897, same date as the other, acts, says the patent, so that the superfluous solder is removed by the combined action of centrifugal force and of an endless brush belt, the centrifugal action throwing off most of the superfluous solder, especially from the end plates, and collecting the remainder in the most advantageous position for removal by the brush substantially as herein set forth. This is substantially the device of the first patent with the endless brush chain added. But it never did effectually what it purported to do, and is but a substantial reproduction of the prior art and defendant does not use such a brush or such brushes. The brush belt of this patent moves in the same direction as the cans, or it might be in the opposite direction. As the cans revolve in contact with the brush, solder is brushed or wiped off, but the seams are not effectually filled. This revolving of the can or of the seams of the can in connection with revolving brushes for the purpose of applying the flux and then the solder and then in connection with long revolving brushes taking off surplus and filling seams were not new. It was patented in 1888, patent to Norton No. 382,320, who said, after describing the application of the flux by the long revolving brushes as the corner of the can rolled between them:

"The invention also consists, in connection with the can carrier and a solder bath in which the corner or seam of the can is immersed, of a pair of long revolving wipers or brushes between which the corner or seam of the can rolls as it advances in the carrier, while the brushes or wipers revolve together and effectually remove any surplus solder from the outside of the can."

One of the brushes takes the surplus solder from the end of the can and the other takes the surplus from the side of the can. This Norton patent says:

"G, G, are a pair of long revolving wiping-brushes, between which the can rolls or revolves after it leaves the solder bath, D. These brushes or wipers may be of any suitable material, but preferably of bristles or asbestus fiber seamed to a suitable head or shaft. These long preferably cylindrical wipers are located immediately after the solder bath, D, and along the path of the can as it advances in the carrier, so that the corner of the can will roll between and in contact with these wipers, and all surplus solder be wiped or removed from the outside of the can."

Then comes the receptacle for receiving and saving the surplus so wiped or brushed off, viz., "These long revolving wipers are journaled on the frame of the machine, and beneath them is arranged a receptacle, G', to catch the surplus solder removed from the can." It required nothing but ordinary mechanical skill to add this device to the first patent mentioned and dispense with one of the brushes, or to substitute an endless brush chain moving or stationary as desired.

The next patent is the same, substantially, as the second except we have the brush so arranged that it acts "on the edges of the cans at right angles to their line of motion." This was old and common in

this art for removing solder and other purposes. Given the old idea that it was better to brush the molten solder directly towards the seam to be filled and left filled than to brush it along parallel with it, and any ordinary mechanic would add such a brush device. All he had to do was to use the Norton idea using only one revolving brush and brushing the side of the can only.

The next Fellows patent, No. 595,704, differs from the others in that the brush or wiper is left out and a line of steam jets is established whereby as the cans pass along between the supporting belts and the impelling belt and rotate axially they are subjected (while hot, of course) to the blast or blasts of vapor against the cans. Fellows refers to his prior application serial No. 605,598, and says:

"The difference being that in said prior application centrifugal force is employed to remove the superfluous solder, whereas in the present case (patent) apparatus is combined and arranged with relation to means for directing a blast or blasts of vapor against the cans. * * * I treat the edges of the cans after they leave the soldering-bath continuously and simultaneously, to fluid under pressure directed to impinge against the exterior portions of the cans where they have been exposed to direct contact with the solder in the bath, the rotation of the cans upon their axes as they are advanced through the device subjecting all such exposed portions uniformly to the cleansing action of the fluid-blast and insuring the removal of superfluous solder from such adjoining portions of the end plates and can-bodies without impairing the hermetical sealing of the joints between said parts of the cans."

Now, this use of a steam or fluid blast for this very purpose was old in this art, and was such common knowledge that I can see no invention in its application. No farmer's boy or helper in a livery stable ever escaped the experience and knowledge that fluid under pressure coming from the nozzle of a hose and directed against any muddy or dirty body would wash off the dirt. The wheels of the vehicle were always put in position to revolve before applying the water under pressure. But in the Edwards patent No. 301,579, dated July 8, 1884, "Tin Can Soldering Machine," we have this very means and idea of means for applying the fluid or steam blast to remove the surplus solder as the cans pass by being carried substantially as by Fellows. Unless kept hot by a furnace or otherwise, steam or some hot vapor must be used to avoid cooling the solder on the cans before wiped or brushed off or blown off. After being crimped the cans are first fluxed, then soldered and then subjected to the steam or fluid blast applied under pressure for removing the surplus solder, such cans being automatically delivered into and carried through the machine and treated continuously and in close succession. Edwards says:

"Fig. 12 is a side elevation of the solder wiper, in which a blast of air or gas under pressure is used. * * * After having one seam, o', soldered the cans are moved up the inclined parts, D' of the rails, D, and during this operation the excess of solder may be wiped off by a wiper, N, and collected in a box, n, thereby saving solder and improving the appearance of the seam. The wiper may be made of any spongy or soft material, which presses against the seam of the can; or a blast of air or steam or any gas may be blown against the freshly soldered seam as shown in Fig. 10, in which nozzles, $N^1$, having slits, $N^2$, are directed against the can as it rises out of the solder and blows the excess back to the rear edge of the seam and off into the solder trough or a box leaving a highly finished seam."

Now, the means used by Fellows for applying the steam blasts consist in this patent of a line of nozzles extending the length of the course traveled by the can, but this defendant does not use. The defendant uses more nearly the appliance of Edwards.

The last patent in suit, No. 595,705, takes up and appropriates the idea of means, etc., of the patent to E. F. Holden, No. 555,244, dated February 25, 1896, for a crimping machine for crimping cans, in which, says the Holden patent, "the can is revolved between two moving surfaces." In can construction the end pieces are bent over on the edges so as to form a flange receiving the ends of the body part, and to press this flange down on the body so as to hold firmly before soldering is called crimping. Holden has two sets of wheels or revolving disks, and, says Holden:

"These disks as above explained are revolving in opposite directions, one set slightly more rapidly than the other. This revolves the can between the two sets of disks, and the strip, G, bearing upon the end of the can crimps it."

"G" is a strip on one of the iron wheels or disks, and as the can passes between the two sets of disks the pressure is such as to press or crush slightly the flanges of the end pieces into close contact with the body. The cans are carried into engagement with the wheels by smaller wheels as the cans come down a chute. As already explained with reference to the endless belts the one wheel carries the can forward and the other moving in the opposite direction retards its forward movement, but as one wheel turns more rapidly than the other the can is revolved on its axis between the wheels before it is carried out of engagement with them. Here we have the can spun about on its own axis while between the wheels, but they are set so as to engage with the cans near their ends so as to crimp the flange. Two wheels on each side of the can, or two sets of disks, are used, as it is necessary to crimp at both ends of the can. One wheel or disk above and one below the can would give the motion and revolution. The speed of the revolution of the can would depend on the speed imparted to the wheels or disks. Fellows is presumed to have been acquainted with this device used in the same art and in the very step preceding the application of flux and solder. All he had to do was to leave off G, the crimping iron, substitute one wheel or disk above for two and one for two below, and arrange them to grasp the can midway the ends and he threw off solder by centrifugal force or action. He added the apparatus for applying the steam to the end of the can as it revolved. By comparing Fig. 1 of Holden with Fig. 4 of Fellows, we see at once that the idea of means for taking cans to and from the wheels or disks and revolving them axially while in contact therewith and passing through is the same. Holden in this very art and industry and in the step preceding that of soldering had taught Fellows how to take a can between two wheels fed in by a chute, and revolve it rapidly or slowly and for a longer or a shorter period of time on its own axis while passing through. Whether he would wash the can, or throw off solder, or polish by steam, or brush off solder, or apply the crimping iron while thus passing between the wheels or disks was a mere matter of choice. The skill of the ordinary mechanic was adequate

to the task of so modifying Holden's apparatus as to adapt it to a mere apparatus for rapidly revolving the can, as all he had to do was to take off the crimping device, G. To expose the soldered seam all he had to do was change the location of the two wheels, upper and lower, and a steam jet could be applied from any source at any exposed point. But it is said that claim 10 of this last patent has a hood surrounding this solder removing apparatus, and an exhausting device for withdrawing the air (supposed to be charged with particles of solder) and injecting it into a receiving chamber. There is nothing new or novel in the hood or the exhausting device, or the receiving chamber, and it was not patentable to apply them to this purpose in this art. All this is but a return to the doctrine of Potts v. Creager and Topliff v. Topliff et al., supra.

It seems to me clear that the new use (so far as there is a new use) of the devices of the prior art—this very industry of making cans—which includes every step and purpose of the Fellows patents, were so nearly analogous to the former uses in the same art, so closely allied, that the applicability of the devices to the new use would necessarily occur to a person of ordinary mechanical skill, and that this is a case of double use. The necessary changes and modifications of the old devices were so simple, so patent and obvious, and the results obtained, especially by the use of centrifugal force for throwing off solder which has been practically abandoned, of so little importance, that they would occur to any mechanic of ordinary skill in this art. In Brown et al. v. Piper, 91 U. S. 37, 23 L. Ed. 200, the Supreme Court of the United States held that:

"The court can take judicial notice of a thing in the common knowledge and use of the people throughout the country."

The basic conception of these patents claimed is that molten solder will fly off from a rapidly revolving can. The next idea is to revolve the cans. The next is to have a succession of cans passing through this operation. The next is to brush off the solder not thrown off. The next drive off by a steam or vapor bath what is not thrown or brushed off, and finally put a cover over the apparatus to confine the flying particles and apply a suction to draw such air and particles contained therein into a chamber where the particles may settle. There is no new idea presented unless it be that Fellows first "thought" that hot solder on a hot can would fly off if the can were rapidly revolved. I cannot accept this as a fact. I think it was perfectly obvious and generally well known that it would. Assume that Fellows and Fellows alone applied the idea to saving solder. Was it a patentable conception if he provided means? Assume so. He did nothing new. He made some ordinary changes in old apparatus, and found that some solder was on the can and some thrown off, too much, and that applied to the industry of can construction his idea and his means were a failure as it was of no practical utility, and the evidence shows that solder saving by centrifugal force in the art of can construction is an utter failure. Revolve the cans and use the brush is the way to do, but this was done before. Revolve the cans and apply a jet of

steam or fluid under pressure is the way, but this was done before. In the language of the Supreme Court in Brown et al. v. Piper, supra:

"The answer is that this was simply the application by the patentee of an old process to a new subject, without the exercise of the inventive faculty, and without the development of any idea which can be deemed new or original in the sense of the patent law."

It is of course settled patent law that, "if a new combination and arrangement of known elements produce a new and beneficial result never attained before, it is evidence of invention." Krementz v. S. Cottle Co., 148 U. S. 556, 13 Sup. Ct. 719, 37 L. Ed. 558. See, also, Wicke v. Ostrum, 103 U. S. 461, 26 L. Ed. 409. "When the other facts in the case leave the question of invention in doubt, the fact that the device has gone into general use, and has displaced other devices which had previously been employed for analogous uses, is sufficient to turn the scale in favor of invention." Krementz v. S. Cottle Co., 148 U. S. 556, 13 Sup. Ct. 719, 37 L. Ed. 558. "The fact," says the Supreme Court in Grant v. Walter, 148 U. S. 547, 13 Sup. Ct. 699, 37 L. Ed. 552, "that the patented article has gone into general use is evidence of its utility, but not conclusive of that and still less of its patentable novelty." See, also, McClain v. Ortmayer, 141 U. S. 419, 425, 12 Sup. Ct. 76, 35 L. Ed. 800. But the apparatus of Fellows for throwing off solder from a can has not gone into general use, as it is plain and not denied that such a device is of no practical utility. Fellows immediately resorted to the old expedient of brushing or wiping and then to the added old expedient of adding and using a steam jet or blast. In the prior art the soldered can was revolved while being brushed or wiped, and in the old or prior art it was also revolved while being subjected to the steam blast. How rapidly it should be revolved was a question of election, choice and expediency. The function of the two endless belts on appropriate pulleys was to revolve the cans. This is what such belts did in the prior art, and the work they would do was well known. The rapid revolution threw off any soft and nonadhesive substance as was well known. The real or true function of the two wheels or disks moving in opposite directions, the one more rapidly than the other, is to whirl the can between them on its own axis and this was well known; they were employed in this art for that very purpose, although not used for the express purpose of throwing off solder, but they are not used for that purpose in the Fellows patents, but to rapidly revolve the can while the brush or the steam jet is being applied. The belts and wheels operate in substantially the same way on the cans and this was well known. The use of the wheels or disks gives a shorter run to the cans—that is, they hold the cans at a certain point, substantially, long enough for the brush or steam jet to do its work. With belts a succession of steam jets was found necessary as the belts did not hold the cans at a given point long enough.

We now have a new art, the construction and operation of flying machines. Whoever takes old elements and adapts them to the successful operation of a flying machine, although the changes be slight, will undoubtedly rank with inventors. He is in a new field, and in that field there are no mechanics skilled in the art. See opinion of Coxe, Circuit Judge, in O'Rourke Eng. C. Co. v. McMullen, 160 Fed.

937, 938, 88 C. C. A. 115. When the arts of telegraphy and electricity were in their infancy the adaptation of old devices and elements to their new use in these new fields, not arts analogous to some other well known and understood, the courts found patentable invention in the adaptation of many things to these new arts for the reason it required something more than the work of the ordinary skilled mechanic to solve the problem. Thought and study and experimentation and mental conception were required. True, such adaptation seemed simple when done, but there was, many times, a brilliant conception in the thought that it could be done at all. In O'Rourke Eng. C. Co. v. Mc-Mullen, supra, Coxe, Circuit Judge, said:

"No one can read this patent without beng impressed with the fact that the inventor is an accomplished engineer thoroughly conversant with the art and impressed with the importance of the difficulties which confronted him. It was no ordinary problem which he undertook to solve. He had to deal with the tremendous force of compressed air in its relation to a continuous passage of the bucket through the lock. The old air locks, hoisting falls and single gates were useless here. Nothing which had been produced before could be utilized to subdue and hold in check the persistent pressure of the air while the journey through the lock was taking place. The lock of the patent in its most minute details was constructed to meet and overcome this difficulty, and to treat the problem as one of ordinary mechanics does injustice to the inventor. Previous to Moran's invention no one had ever taken material through the lock by a continuous hoist. The defendant's expert says: 'No instance has come to my knowledge where material was hoisted straight through prior to the date of the Moran patent.' The idea of doing this was a bold and brilliant one, and was at first deemed chimerical and impossible by hydraulic engineering. When, however, it became an accomplished fact, it made a decided sensation among contractors, engineers and builders, and was hailed as 'a flash of genius.' The Moran locks were at once adopted and are now in general use. * * * Bearing in mind that Moran's invention relates solely to an air lock so constructed that material can be hoisted 'straight through' it, and confining it to this feature alone, it may be said truly that there was no prior art. No one had ever done this before, although the necessity for such action was generally recognized. Moran's idea was new and brilliant, and he carried it out by constructing a new air lock bringing together elements, several of which were old, but which were never combined before. In other words, the combination was new and produced a new and highly useful result. To do this, we think, involved invention."

In Hobbs v. Beach, 180 U. S. 383, 392, 21 Sup. Ct. 409, 413, 45 L. Ed. 586, the court said:

"While none of the elements of the Beach patent—taken separately or perhaps even in a somewhat similar combination—was new, their adaptation to this new use and the minor changes required for that purpose resulted in the establishment of a new industry, and was a decided step in advance of any that had theretofore been made."

But here we have no new industry established, no new art, no new result, for Fellows was compelled to fall back upon and rely upon the old ideas and methods of brushing off the solder or of removing it by the application of the steam jet under pressure or both. He has added nothing of importance to the sum of human knowledge, unless it be the fact that in can construction the superfluous solder cannot be removed by the application of centrifugal force and produce a reasonable proportion of cans suitable for use. The court is to lean with favor to the true inventor, the person who adds to the sum of human knowl-

edge, creates a new industry by the use of his inventive faculties, or who in the same way substantially improves an old one so as to confer a substantial benefit on mankind. However, it is neither every improvement nor every change in mechanical combinations used in old and established industries that constitutes invention. The skilled mechanic has his field and the inventor has his, and it is, many times, very difficult to draw the line. Judges have differed and always will differ in arriving at a satisfactory conclusion when the question is that of invention or noninvention in adapting old devices with slight modifications to a new use, or rather to the doing of work not done by that mechanism before. Here in the final wind up of the Fellows invention and as used by the defendant there is a succession of devices operating the one after the other. Entering from a chute the cans are taken by the endless belts, and, guided by side bars or rails, rapidly whirled for a short distance when they come in contact with the brush revolving at right angles to the path of the cans and, passing it, come to the two wheels between which they are revolved as described while the steam jet or blast is applied. These operations on a can succeed each other after the cans leave the solder bath. They are not in operation on the same can at the same time. It is contended that this is not a mere aggregation, and probably this is true although dangerously near it. It is saved, if at all, by the fact that the surplus solder is being removed all the time—that is, first by centrifugal force, then by the combined action of centrifugal force and the brush, and lastly on arriving at the two wheels by the whirling of the can and the action of the steam jet. The brush and steam also act to polish the can at the points of contact. If the centrifugal force first applied and operating tends to move the solder out of the seams and away from them and not into them, as is necessary, it is said the brush moves or drives it in, and that then the steam jet operates to disintegrate or reduce to fine particles that which remains outside and wash it off, and that this is aided by the throw-off action in the rapid revolution of the can. Hence, it is said, a better, more perfect result is produced after undergoing all these operations than was attained before. But no one of the patents in suit is for such a combination as already seen. True, in patent No. 595,705, of December 21, 1897, Fellows has the forwarding wheel, F, concentric rails, C, and shows, in Fig. 4, four of the minor wheels or "auxiliary wheels," $A^1$, $A^2$, $A^3$, and $A^4$, and as the can is taken by F and $A^1$ it is subjected to centrifugal force, and when taken by F and $A^2$ it may be brushed, and when taken by F and $A^3$ it may be subjected to the steam jet. But I fail to find evidence that defendant has ever appropriated or used such a combination or succession of wheels. This is but a succession of auxiliary wheels moving in conjunction with the main wheel, F, used for subjecting the cans to a series of operations. Indeed, Fellows says that the number of auxiliary wheels required depends on the number of operations the cans are to undergo. To my mind, in view of the prior art, there was no patentable novelty in duplicating the auxiliary wheels and placing a brush at one end and a steam jet at another and so on. Rapid revolution of the cans and the application of centrifugal force to keep the solder from running and dripping was in the prior art; more rapid revolution would throw it off, and this was a well-

known and understood law. Indeed, in the specifications of patent No. 595,705, Fellows says:

"It is obvious that by imparting a sufficiently high degree of speed to the forwarding wheel, F, the cans resting against the rails, C, may be rotated upon their axes in such manner as to throw off by centrifugal force superfluous solder."

This was a well-known and understood law. Rapid revolution of the cans and the application of a brush to brush off the solder was in the prior art. Rapid revolution of the cans and the application of the steam or vapor, etc., was in the prior art to pulverize and drive off the surplus solder. To subject the cans to these well-known operations, the one after the other, and by slight changes adapt old means to the end did not elevate Fellows to the rank of an inventor having in view the prior art.

It is claimed by defendant that it is at liberty to use all these devices in its milk business (and it is conceded it has not infringed, if the patents be valid and defendant has infringed at all, except by using the device or devices in its milk business) by virtue of a certain license to the Anglo-Swiss Company, of which this defendant is the assignee and to whose rights it has succeeded, and that there is a defect of parties, the Anglo-Swiss Company being a necessary party complainant or defendant, etc. I do not deem it necessary or proper for me to go into these defenses as they will be fully considered by the Circuit Court of Appeals when it passes on the case. I am dealing with the case finally as it impresses me on a careful study of the claims, the specifications, the prior art, the evidence of Fellows himself, and that of the experts on both sides, and applying thereto the decisions of the Supreme Court of the United States and of the Circuit Court of Appeals in this circuit.

There will be a decree dismissing the bill, with costs.